IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| LEANDRA ADKISON,<br><br>   *Plaintiff,*<br><br>V.<br><br>TEXAS DEPARTMENT OF STATE HEALTH SERVICES,<br><br>   *Defendant.* | Civil Action No. 5:22-cv-1168 |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Leandra Adkison ("Ramirez") files this Original Complaint against Defendant Texas Department of State Health Services ("DSHS"), and in support thereof, states:

### I. PARTIES

1. Leandra Adkison is a female individual residing in San Antonio, Texas. She previously worked as Custodian 1 at the Texas Center for Infectious Disease Hospital ("TCID"), which is a public health facility of the DSHS.

2. Defendant Texas Department of State Health Services is an agency of the State of Texas and may be served at 1100 West 49th St., Austin, Texas 78756-3199.

### II. JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 28 U.SC. §§ 1331 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

4. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District. Specifically, Defendant employed Adkison in San Antonio, Texas.

1

5. Title VII clearly abrogates the State of Texas's Eleventh Amendment immunity, such that "federal courts [may] award money damages in favor of a private individual against a state government found to have subjected that person to employment discrimination on the basis of race, color, religion, sex, or national origin." *Fitzpatrick v. Bitzer*, 427 U.S. 445, 447 96 S. Ct. 2666, 2667-68, 49 L. Ed. 2d 614 (1976); *see also Ussery v. La. ex rel. La. Dep't of Health & Hosps.*, 150 F.3d 431, 434 (5th Cir. 1998).

### III. FACTUAL ALLEGATIONS

6. Adkison started working for the Texas Center for Infectious Disease (the "Center") in June 2019.

7. In August or September 2019, the Center assigned Mark Green to be Adkison's supervisor.

8. Almost immediately, Green began subjecting Adkison to a hostile work environment based on sex. For example, Green consistently made inappropriate comments to Adkison, such as inquiring whether she had a boyfriend, whether she had ever had sex with a Black man, and when she was going to give a "Ni**er" like him a chance.

9. Green told Adkison that "once you go black, you don't go back."

10. Green also repeatedly asked Adkison to "get with" him, which she interpreted as Green asking Adkison to have sex.

11. Green told Adkison that if she "got with" him, Green would make sure that Adkison received a quarterly bonus, which Adkison believes was approximately $2,000.

12. Green then asked Adkison for money if Adkison received the quarterly bonus. When Adkison declined, Green asked her to take him out to dinner at an expensive restaurant. This statement was recorded and provided to TCID and to the EEOC. Ruben Acevedo, Green's

supervisor, acknowledged to the EEOC that this comment was inappropriate and that Green was counseled for it.

13. In the same conversation, Green said to Adkison, "I really want to get with you, but I want you to clean up your mess." Acevedo told the EEOC, "If I would have known that information, I might have terminated Mr. Green." Acevedo claimed he had never heard the recording of Green saying that, even though it was part of the same recording he acknowledged listening to, and even though the entire recording was less than two minutes long.

14. On other occasions, Green looked at Adkison seductively and licked his lips, blew her kisses, touched her waist without her consent, and texted her at night after work hours.

15. Green's inappropriate conduct was entirely unwelcome and made Adkison extremely uncomfortable.

16. In mid-September 2019, Adkison saw an individual whom she recognized as a patient at her apartment complex. The individual approached her and said, "You work at the hospital." Adkison immediately told her supervisor, Anna Garcia, about the run-in. Adkison ran into the individual at her apartment complex several more times and did her best to avoid him. She never exchanged more than basic courtesies with this individual and she did not spend time with him. However, he knocked on Adkison's door several times and she did her best to discourage him. She reported each incident to Garcia.

17. As Green's harassment continued despite her requests that he stop, Adkison decided to report his conduct. During the last week of September 2019, Adkison complained to the Center's Risk Management Officer, Malissa Piedra, about Green's inappropriate conduct.

18. Adkison told Piedra about the following incidents, and others: Green invited Adkison over; Green made comments about how Adkison looked every day; Green made

comments about how clothes fit her; Green made comments about her makeup and why she did not wear more; and Green commended about how "innocent" and "intelligent" Adkison looked wearing glasses.

19. Adkison also told Piedra about Green attempting to bribe her for a bonus.

20. Piedra said to Adkison, "Did you know that's sexual harassment? He can be fired for that."

21. However, Piedra told Adkison that Piedra was not the right person to report sexual harassment to and that Piedra could not help. Piedra told Adkison to follow the chain of command by complaining to Green's supervisor, Ruben Acevedo.

22. Adkison feared that she would be retaliated against if she complained to Acevedo.

23. On or about October 15, 2019, while Adkison was walking through her apartment complex, she noticed San Antonio police looking for the hospital patient. The patient had recently gone missing from his hospital appointments and was considered a public health threat. Adkison advised police that she believed the individual could be found in a certain apartment. The police located the individual and his roommate immediately became enraged at Adkison for not sharing the patient's contagious disease. The police officer and Adkison herself informed the roommate that she could not discuss health information with anyone. Adkison immediately let Garcia know what had happened.

24. Adkison also took a picture of the individual while he was arrested, but she did not show it to anyone outside of employees at TCID. The photo was from far away and it was impossible to identify the individual from the photo.

25. On or about October 23, 2019, Adkison mustered up the courage to complain to Acevedo about Green's inappropriate conduct. She reported essentially the same complaints to Acevedo as she had to Piedras.

26. Unfortunately, Adkison's concerns about retaliation were justified. The same day that Adkison finished meeting with Acevedo, Adkison's team leader Anna Garcia told Adkison that Green wanted to meet her in the back-supply room.

27. Once there, Green confronted Adkison about complaining to Acevedo. Green told Adkison he heard she had been complaining about him and making her feel uncomfortable. Green told Adkison that he had just been joking with her.

28. During that same conversation, Green told Adkison she would be written up for a HIPAA violation, which was apparently because Adkison took a picture of the individual in her apartment complex while he was being arrested. Green informed Adkison, "It's about the violation of HIPAA, whatever that is." Green even told Adkison that he did not know that what Adkison had done was a HIPAA violation. Nevertheless, Green was preparing a disciplinary write up for Adkison, which included an 18-month probation.

29. Later, when Green gave Adkison the write up he had drafted, Green told Adkison to simply sign the write up because it was "just a tap on the wrist" and it was "no big deal." He said, "if you sign it, ain't nothing going to happen." He acknowledged that he did not read the write up and simply copy and pasted it.

30. Adkison did not violate HIPAA and this write up was simply retaliation for complaining about Green's inappropriate conduct.

31. On November 1, 2019, Adkison was alone with Green in the X-ray clinic. He asked Adkison if she was going to give him a chance, which she interpreted to mean he was again asking Adkison to have a sexual relationship with him.

32. Adkison told him that she was walking away, and Green responded that she did not have the right to walk away from him and Adkison owed him an explanation. Adkison told him that she did not owe him an explanation for walking away. Green responded that she was quitting and if she walked away she would be fired.

33. Adkison was forced to contact Malissa Piedra, because she felt unsafe and violated. The Center implemented a safety plan that, among other things, stated, "In the event Ms. Adkison needs to speak with Mr. Green she will be accompanied by her team lead Anna Garcia . . . ." However, Adkison still did not feel safe or supported at work due to Green's ongoing inappropriate interactions with her.

34. Adkison filed her original Charge of Discrimination with the EEOC on December 2, 2019. On December 9, 2019, the Center informed Adkison that they intended to terminate her for the exact same alleged HIPAA violation that she had already been placed on probation for.

35. Adkison was permitted only until the next day to submit a rebuttal, which she did through counsel.

36. On December 28, 2019, Adkison received a letter from the Center, dated December 23, 2019, that they had decided to terminate her effective December 11, 2019 for the same reasons stated in their December 9 letter. This decision was simply retaliation for complaining about Mr. Green's inappropriate conduct, especially because Adkison had already been placed on probation for the exact same alleged conduct.

37. Adkison's termination was in retaliation for her protected complaints of sexual harassment, including her original EEOC Charge.

38. Green has also been terminated from TCID. On information and belief, other female employees complained about Green's sexual harassment of him and he was finally terminated. One individual, a former Licensed Vocational Nurse for TCID, reported to the EEOC that Green was "creepy" and had asked her out on a date. Green even offered that she could spend the night at his house. This LVN informed the EEOC that, one day when she and Adkison had lunch together, Green told them they "were pretty like the flowers."

## IV. CAUSE OF ACTION NO. 1: SEXUAL HARASSMENT UNDER TITLE VII

39. Adkison incorporates all of the allegations made above.

40. Defendant intentionally discriminated against Adkison in violation of Title VII by creating a sexually hostile work environment. Specifically, Adkison belongs to a protected group (female); Adkison was subjected to continuing and on-going unwelcome sexual conduct constituting harassment, which was based on sex; and the harassment complained of affected a term, condition, or privilege of employment.

41. Adkison's supervisor caused this sexually hostile work environment.

42. Adkison's supervisor also created a hostile work environment based on sex by subjecting her to a quid pro quo.

43. Adkison objected, protested and reported incidents of sexual harassment to management, but the reports were either ignored or rebuffed. Defendant failed to exercise reasonable care to prevent, cure and/or correct sexually harassing behavior in the workplace.

44. In addition, Defendant failed to prevent sexual harassment from occurring in the workplace by, among other things: failing to monitor the workplace; failing to provide an

adequate system for handling sexual harassment complaints; and failing to respond to sexual harassment complaints.

45. Defendant is vicariously liable for the sexual harassment perpetrated by its employee to Adkison and is liable for failing to remedy sexual harassment in the workplace.

## V. CAUSE OF ACTION NO. 2: RETALIATION UNDER TITLE VII

46. Adkison incorporates all of the allegations made above.

47. Under 42 U.S.C. §2000e-3(a), it is an unlawful employment practice for an employer to discriminate against any of its employees because that employee has opposed any practice, which constitutes sexual harassment and/or discrimination based on sex.

48. Defendant retaliated and/or discriminated against Adkison for her opposition to a discriminatory practice, including but not limited to her opposition to Green's sexually harassing behavior and her complaints to management regarding Green's sexually harassing behavior.

49. After Adkison opposed Green's sexual harassing behavior and management's failure to end the sexually harassing behavior, Adkison suffered a material adverse employment action, including, but not limited to termination. Said material adverse employment action would not have occurred "but for" Adkison's opposition to Green's sexually harassing behavior.

50. That is, the termination of Adkison was in direct retaliation for the exercise of her rights to oppose, object and report the ongoing sexual harassment in the workplace.

## VI.   DAMAGES

51. As a direct and proximate result of Defendant's unlawful actions, Adkison has sustained injuries and damages, which include, but are not limited to severe emotional distress, mental anguish, humiliation and embarrassment in the past and which in reasonable probability will be suffered in the future; past and future lost wages and benefits; loss of employment

capacity; past and future medical bills, and such other damages as will be more fully shown at trial and for which Adkison specifically sues herein.

## VII.   ATTORNEY'S FEES AND COSTS

52. Adkison is entitled to an award of attorney's fees and costs under Title VII, 42 U.S.C. §2000e-5(k).

## VIII.   JURY DEMAND

53. Adkison demands a trial by jury.

## IX.   PRAYER

WHEREFORE, Leandra Adkison prays for judgment herein in her favor against Defendant for the following:

a. actual and consequential damages, including, but not limited to back pay (wages and benefits) and medical bills in the past and future;

b. compensatory damages, including, but not limited to severe emotional distress, mental anguish, humiliation and embarrassment in the past and which in reasonable probability will be suffered in the future;

c. punitive damages;

d. prejudgment and post-judgment interest;

e. attorney's fees;

f. costs of suit;

g. equitable relief, including, but not limited to reinstatement or front pay (wages and benefits); and

i. any other relief to which Plaintiff may be entitled, whether in law or equity.

Respectfully submitted,

/s/ Lawrence Morales II
LAWRENCE MORALES II
State Bar No. 24051077
ALLISON S. HARTRY
State Bar No. 24083149
**THE MORALES FIRM, P.C.**
6243 IH-10 West, Suite 132
San Antonio, Texas 78201
Telephone No. (210) 225-0811
Facsimile No. (210) 225-0821
lawrence@themoralesfirm.com
ahartry@themoralesfirm.com

***ATTORNEYS FOR PLAINTIFF***